And this is Clarence Potthast v. Allen Potthast, if that's the correct pronunciation. And Mr. Carr, are you ready to proceed? Yes, sir. Please do so. Good morning. Good morning. Early in law school, law students soon learn that the objective of court law is to make people whole. They soon learn that the reason we have laws to compensate those that are harmed is because that's the only real way to live in a just society. We soon learn as well that just because it's your brother that harms you doesn't mean you forfeit your rights. Here it's very clear that all of the evidence showed that the wood that Mr. Potthast had in his barn, the sawmill, the day that it was burned down, was worth between $500,000 and $1 million. What's in the record to support that? Just the wood. What's in the record to support that the wood was worth $500,000 to $1 million? We have Mr. Potthast's own calculations. He had been in the business ever since, well, basically his dad was in the business, so he was born into the sawmill business. He knew how to value wood. He knew exactly the amount of wood that was in there. He had customers that came in and testified as to the inventory that the sawmill was packed in there. No one challenged the amount or the inventory that was in there. He had another expert, Phil Haskins, who did cabinet work and had purchased wood there and valued the wood. And so he had ample evidence in the record that there was between a $500,000 or $1 million, depending on whether we're talking wholesale or retail, value on the wood that was in there. That testimony and that evidence was never contradicted by any written evidence, by any spoken testimony. There was nothing in the record whatsoever to contradict what Mr. Potthast testified to, what Mr. Haskins testified to, and what Mr. Potthast's clients testified to. So it's unimpeached, uncontradicted, unrebutted evidence that Mr. Potthast, well, Clarence Potthast, lost that wood. Now, that doesn't include his tools. That doesn't include his equipment. That doesn't include the building. Just the wood that had been accumulated by his uncle, by his father for a period of, you know, 50-some years that was in there that Mr. Potthast had been – Clarence Potthast and his father had been gathering for free different types of wood that he had been trading for was all in that sawmill, which was jam-packed with valuable commodity. Just imagine it was barrels of oil. Just imagine it was nuggets of gold. Just imagine it was silver. This wood is just as much a marketable commodity as any other commodity. And the owner and the most knowledgeable witness, very credible, gave a value for that wood, which was even below the amount that Mr. Haskins had placed on it. So it's very clear under Illinois law that Clarence Potthast has a right, under Illinois court law, to be made whole. Unfortunately, the jury must have thought that, you know, insurance is going to cover this wife, poor Alan Potthast's brother. We had to excuse one juror. We don't know that, do we? That's speculation of what they might have thought. We were just – we were speculating, but during the war dire, actually one of the potential jurors did say he would never rule one brother. He didn't think it was ever right that one brother would sue another brother, and we had to excuse him. And there's nothing other – that would be in the record, but there's nothing other than that in the record. But basically that's the only logical explanation in the face of no impeachment of Clarence Potthast, no contradictory evidence of the amount and the value. Mr. Alan Potthast didn't put on an expert to say the wood is worth less than that. Mr. Alan Potthast didn't get in and say, no, that wood was not in there. I was in my brother's barn that day because I remember he plugged in his tractor that caused the fire. He didn't say, no, my brother's exaggerating, all that wood wasn't in there. So under every type of court law that's known to man, Clarence Potthast is entitled to be made whole, which is between $500,000 and a million just for the wood. Not talking about equipment, not talking about tools, not talking about the building, not talking about the entire sawmill business, just the value of the wood. That's all we're talking about, what was in there. This was his retirement plan. He was saving it up. He was not trying to get rid of that. He was going to get that increased value without having to pay income taxes on it because he was not selling it. And he lost his entire $500,000 to a million dollar retirement. I have nothing further. Okay, thank you. Mr. Price, would you please proceed with your argument? Thank you very much. May it please the court and counsel. My name is Dan Price. I represented the defendant, Alan Potthast, in this case. Mr. Carr's argument sounded an awful lot like the final argument that was made to the jury at the time the case was tried. And it was a compelling argument then, and it was rejected in part and accepted in part. And what he did not mention, what this court is obviously aware of, is the test on review. And that is whether or not the verdict of the jury return is supported by the manifest way of the evidence or against the manifest way of the evidence, to say it another way. Mr. Carr focused on the value of the wood, so let me go directly to that particular item because of its significance in his argument. Mr. Potthast testified that the wood, if sold as a lump on the day of the fire, would have been worth $500,000. And if it was sold piecemeal, it would have been worth a million. What Mr. Carr didn't mention was that it was established in the evidence that the sawmill was purchased by Mr. Clarence Potthast in the year 2000. And in the year 2000, at the time that it was purchased, he paid $7,000 for the property, which included all of the equipment and all of the inventory that was present at that time, which he said was low. And so then what we have is a continuum between 2000 and 2006 when this fire destroys everything. The purchase was made from his father, right, a family relationship. Well, it certainly is. There's family relationship throughout this. But, I mean, the testimony in the record is that it was $7,000 and that was everything, and that included the inventory. And there's nothing to contradict that anywhere that's on record. And in any event, it's now contended, six years later, that this property that was worth $7,000 is now worth $500,000 to a million. And so naturally, we attempted to put in the tax returns showing the activity of Mr. Potthast between 2000 and 2006 at the time of the fire. And that's all in our statement of facts in the brief. I won't go through it, but it's minimal. Was your expert only testifying about the equipment and the real estate? If you didn't have an expert either to value the wood, nobody had an expert other than the plaintiff. Other than Mr. Potthast, no one testified about the value of the wood. And from the defense perspective on a matter like that, I think the reason is rather evident. To try to value the wood, you first have to accept whatever Mr. Potthast says was there, which we were obviously contesting in the first instance. So, I mean, to try to get someone to value wood would be difficult in that circumstance because we were forced to contradict what he said the value of the wood was by the circumstances surrounding his purchase and the other things that affected that opinion. A minor one being the fact that the sawmill, which was in very dilapidated condition, had a big door that was constantly open. So anybody could go in and out any time, 24 hours a day. Perhaps a minor point, but it certainly doesn't seem like the way one would safeguard a commodity worth a million dollars. Those are the kind of things that we had to rely upon in pointing to the jury that this was not something that they had to accept. We take the position in our brief, and I believe it to be the law in Illinois, and we all support it, is that when Mr. Potthast, as the owner of property, offers his testimony about what it is worth, that is an opinion. That is an opinion of an owner of property as to value. And that is significant because the jury was instructed, including IPI 2.08, which is the opinion instruction, and it says, you know, you've heard people have opinions about certain skills, et cetera, and you are free to give that opinion whatever way you believe it deserves. You don't have to accept it. And I think that's consistent with, you know, the general law that applies to opinion testimony overall. Is it your contention that in 2000 the fair market value of the property was $7,000 based on the sale price? Yes, sir. Okay. That's correct. In your understanding of the evidence, was there any testimony as to what the plaintiff's basis in the lumber in the shed was worth, meaning you work off if he was going to report a capital gain of a million dollars next year and it not burn down, would he have a basis in the property? There was nothing like that that is of record. You know, one issue that's always prevalent in fire cases is, you know, what if something burned up in the fire? You know, records of that sort of thing. And you can find in the record where I've cited it where I asked him very clearly, did you keep any sort of records about this wood? And he said no. Now, at another point, he did try to say that some things were burned up in the fire, so the record is a little mixed on that, you know, to be perfectly accurate about it. Did he testify anything about what he paid to acquire this wood? No. I didn't see any explanation at all about that, and that's one of the things that was very frustrating and one of the things we've argued. You know, where did this wood come from? How did this value appear out of, you know, over this period of time? What's the explanation? How did this dwindle occur? And, you know, this $7,000, I could tell Judge Wexton was somewhat questioning that because of the intrafamily nature of things. And one point that I think should be mentioned that's consistent with that is that Mr. Kottes himself hired an appraiser in 2005 for the purpose of lowering his real estate taxes. But this appraiser came forth with an opinion about the sawmill, the building itself, and the property as worth $5,000. And basically the sawmill itself was in such a condition that tearing it down enhanced the value of the property. And that was something that the jury heard and could consider. And at the same time, Mr. Kottes offered the opinion that his sawmill that was worth $5,000 in 2005 had a value to him of $500,000. Now, that's the building and the equipment. So, I mean, when the jury is considering what he said about his wood inventory and its worth, they would have heard that as they have heard all these other things in determining the weight which should properly be assigned to it. And, well, when you consider all of that, $70,000 for the equipment and $30,000 for the building is certainly within the range of the potential evidence. And that's what the jury returned. And I understand that, you know, in any lawsuit somebody is disappointed, but that's not the reason it brings us here. The reason it brings us here is that it's against the manifest way of the evidence that the jury had to consider. And I cite the Tyco case on page 10 or 11 of the brief, which there were two experts in the range of the expert testimony. It was some kind of computer equipment or something. One was like $10 million and the other was like $4 million. And the jury came back with $2 million. So they listened to everybody and made their own determination about what the property itself was worth. And the court in Tyco said that just because the jury does not accept the opinions of the experts does not make their decision against the manifest way of the evidence. And I think that that's the case that the court and the parties are confronted with here. And unless there's something in particular that the court would like me to address, we've done our best to address these issues in the brief, and we'll stand on that. Okay. Thank you. Thank you very much. Mr. Carter, rebuttal. Thank you so much. Thank you, Dan. Mr. Price. I'll just go in reverse order. First, it was interesting. I don't know if the Freudian slip or not, but he said that the jury awarded $70,000 for equipment and $30,000 for the building. No, it wasn't $70,000 for the equipment. It was $70,000 for the wood, the tools, and the equipment. $70,000 for the equipment, then we might have been arguing, look, our witness said this, your witness said that. But there was no evidence up to the value of the wood other than what we presented. He says the real estate tax issue in 2005, I think Judge Knight actually excluded that and said this appraisal of a sawmill building for purposes of real estate tax purposes is not relevant. Again, that's the real estate. It has nothing to do with the value of the wood. How did he get the wood? It is in the record. He would get it for free. He would go out, if somebody had their trees fall down, he would go cut it down. He would age it over time. It would sit out in his lumber yard. He would add value to it. He knew how to cut it. There's expert testimony other than him about how good and how correct he would let it dry and why this type of wood is more valuable than the wood you're going to get at Lowe's or Menard's or somewhere like that. There's expert testimony in there that he would let it dry out, that he knew the grains to cut. He knew the pieces to take. He knew the ones with the knots, the ones that weren't the knots. He learned it from his father. He learned it in school as well. He actually does have a degree in chemistry. He also took classes in grading this wood and how to grade the wood. There were, again, other witnesses besides just him as to the inventory. He said, here's how many feet of walnut I have. This is the value per foot of walnut. There's how many feet I have of cherry. Here's the value per foot of cherry. It's a commodity, just like oil, just like anything else. It fluctuates. It goes up and down. He knows those values. No one else came in to contradict the value that he placed on his wood there. He itemized exactly what it was. He did testify that his written records were burned up there, which is natural to think that he would keep his records in his sawmill. Again, his brother could have come in and testified to the opposite. They could have gotten some of his customers to come in and say, no, that wood wasn't in there. There wasn't walnut in there. There wasn't cherry in there. There wasn't mahogany in there. There was just a bunch of maple. That wasn't the value. They did not do that. Why? Because they knew that his testimony was credible and accurate, and it was not impeached whatsoever. Did his income tax reports reflect his sales to his customers, or how much value did he have? I think so, but again, remember, this was his retirement income. It would be like saying he had a gold mine. He's digging out gold, and he's not selling the gold. He's getting it for free. Gold is increasing in value. Why are you going to sell it? The trees are becoming less scarce. His ability and skills to cut that kind of wood and keep that wood. So his wood is becoming more valuable. So his idea was, while I'm strength and hardy, I'm going to cut this wood down. I'm going to put it in the sawmill so that someday, when I'm old, I can be selling it. And that was totally destroyed. It was all burnt up, and he didn't get $70,000 for his equipment. He got $70,000 for all that wood that he got. And I think the court can see clearly. So he paid $7,000 to his dad in 2000. Number one, inventory fluctuates. What was the inventory that was there in 2000? Even if that was relevant, because it was from his dad, if that was some sort of indicator of what the market value was, I don't think anybody would have crazy enough to sell something. If I sell something to my children, it's going to be the same as what the market value is. But let's say it was, and it was just a few planks in there. What does that have to do with how much work he did from 2000 to 2006 so that he had his sawmill full of wood? No one contradicted that evidence. No one said, well, in 2007, it was full of wood, and it was worth $7,000, and it had walnut and cherry. No one contradicted what he said. He said that he bought it for $7,000 from his dad because he's helping his dad. His dad was sick. In fact, his dad's own casket that he handmade was in the sawmill. Now, what was the value on that? We couldn't get any emotional distress if we couldn't get that in, but he actually handmade his dad's casket, and it was in that sawmill. So am I correct that for that six-year period, none of the wood was sold? No, no, some of the wood. That's what we're saying. Some of the wood, there was some sort of a business value. He did have a regular ongoing sawmill business, but he's also thinking he had his wife who was supporting paying the bills, so he's out there making his business. So for the wood that was sold, was there evidence about who he sold it to and how much? Oh, yeah. He had those, and that's in there. Actually, Phil Haskins, the one we mentioned, the cabin maker, came over from St. Louis and said you can't get the kind of wood that he would get from Clarence anywhere else. He would drive over from St. Louis to buy that wood, and he valued the wood at a greater value than what Clarence valued the wood. So yes, that evidence is in the record. Thank you. We appreciate both of your arguments and your briefs this morning, and we will take the matter under advisement, provide you with a decision on the earliest possible date. Thank you. We're going to take a break for lunch. We'll start at 1 o'clock. All rise. 1 o'clock. I didn't know what I was supposed to get after. 1 o'clock.